Hunter J. Shkolnik
Annie E. Causey
NAPOLI SHKOLNIK PLLC
1301 Avenue of the Americas, 10th Floor
New York, New York 10019
(212) 397-1000
hunter@napolilaw.com
acausey@napolilaw.com

Brittany Weiner
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
(212) 736-0007
brittany@lawicm.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
YEHUDA GUTTMAN, individually, and on behalf of
all others similarly situated,

                                          Plaintiffs,

                                       v.

VISA, INC., MASTERCARD, INC., AMERICAN
EXPRESS CREDIT CORPORATION, J.P. MORGAN
CHASE & CO., MERRICK BANK CORPORATION,
CAPITAL ONE BANK, PAYSAFECARD.COM USA,
INC., VANTIV, INC., FANDUEL, INC., and
DRAFTKINGS, INC.,

                                       Defendants.

------------------------------------------------------------------X

**Civil Case No.:**

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

       Plaintiff YEHUDA GUTTMAN ("Plaintiff"), on his own behalf and on the behalf of all

others similarly situated, as and for his putative class action against VISA, INC.,

MASTERCARD INC. and AMERICAN EXPRESS CREDIT CORPORATION (collectively

"Facilitator Defendants"), J.P. MORGAN CHASE & CO., MERRICK BANK and CAPITAL

ONE BANK (collectively "Bank Defendants"), PAYSAFECARD.COM USA, INC. and

VANTIV, INC. (collectively, "Payment Processor Defendants"), and FANDUEL, INC. ("FANDUEL") and DRAFTKINGS, INC. ("DRAFTKINGS") (together, "Online Gambling Defendants") alleges as follows:

## NATURE OF THE CASE

1.      Plaintiff is one of thousands of people who have wagered and lost money through FanDuel's and DraftKing's (the "Online Gambling Defendants") illegal sports gambling websites.

2.      The Bank Defendants lent monies and/or credit to Plaintiff for the bets and/or wagers that Plaintiff placed with FanDuel and DraftKings.

3.      Plaintiff used the credit that the Bank Defendants provided to Plaintiff to wager on illegal sports betting schemes created, and/or owned, and/or operated by FanDuel and by DraftKings.

4.      FanDuel and DraftKings operate illegal online sports betting businesses that accept wagers from persons across the nation, except from persons in those states where the states' regulatory authorities have prohibited them from doing so.

5.      The Bank Defendants are in the business of loaning money that was and continues to be used by their recipients, such as Plaintiff, for placing bets through the illegal gambling schemes created and operated by FanDuel and DraftKings.

6.      The Bank Defendants issued Plaintiff loans for illegal gambling offered by FanDuel and DraftKings, which loans Plaintiff did use for such purpose.  The Facilitator Defendants received a fee from the Bank Defendants for facilitating the transfer of the money that the Bank Defendants lent to Plaintiff and that Plaintiff used for illegal gambling with DraftKings and FanDuel.

7.      The Payment Processor Defendants serve a "player banking function," receiving a fee as the financial intermediary between FanDuel and DraftKings and its customers.

8.      The Bank Defendants have collected and continue to collect debts on the credit that the Bank Defendants lent Plaintiff and others similarly situated that Plaintiff and others used in connection with the illegal online DFS gambling platforms operated by FanDuel and DraftKings.

9.      New York prohibits the Bank Defendants' conduct because New York law prohibits the enforcement or collection of debts issued for illegal gambling.

10.     Accordingly, and as set forth in more detail, *infra*, Plaintiff commences this class action on his own behalf and on behalf of all others similarly situated (i) against the Bank, Payment Processor and Facilitator Defendants, to enjoin them from further efforts to collect these unlawful debts and from accepting payments in satisfaction of these unlawful debts, (ii) against the Online Gambling Defendants, to enjoin them from continuing to aid and abet the Bank, Payment Processor and Facilitator Defendants in their efforts to collect these unlawful debts and accepting payments in satisfaction of these unlawful debts, (iii) against all Defendants for an award of restitution for those payments that the Bank Defendants received in partial or full satisfaction of these unlawful debts in violation of New York common law, 18 U.S.C. § 1962, and New York General Obligations Law ("NYGOL") § 5-441, (iv) against the Online Gambling Defendants, restitution of all monies wagered and lost, and of any and all other monies paid to Online Gambling Defendants in connection with Plaintiff and class members' use of their services pursuant to New York General Obligations Law § 5-411 and a declaration that the contracts governing such conduct are void pursuant to the same, (v) against the Bank, Payment Processor and Facilitator Defendants, restitution of all monies wagered and lost, and of any and

all other monies paid to Online Gambling Defendants in connection with Plaintiff and class members' use of their services, sustained through the Bank, Payment Processor and Facilitator Defendants' aiding and abetting the Online Gambling Defendants' illegal conduct pursuant to New York General Obligations Law § 5-411, (vi) against Online Gambling Defendants, to recover lost wagers pursuant to New York General Obligations Law § 5-421.

## PARTIES

### Plaintiff

11.     Plaintiff YEHUDA GUTTMAN is citizen of the State of New York State and resides in Kings County.

### Online Gambling Defendants

#### A.     DraftKings

12.     Defendant DRAFTKINGS, INC. is a Delaware Corporation headquartered Boston, Massachusetts, with substantial business activities in New York City.  DraftKings is a citizen of the States of Delaware and Massachusetts.  DraftKings is a gambling service provider authorized to conduct business and purposefully does conduct business throughout the State of New York.

13.     DraftKings is operating an illegal online sports betting business within the State of New York.  In addition to its operations being illegal, its contests are intentionally unfair, rendering its contracts with its customers unconscionable and void of good faith.

14.     DraftKings defines its sports betting scheme as Daily Fantasy Sports ("DFS") in a feeble attempt to circumvent New York Penal Law ("NYPL") which expressly prohibits profiting from "any contest, game [or] gaming scheme…in which the outcome depends in a

material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."

15.     DraftKings' sports betting contests are based upon the performance of team and individuals that participate in NCAA college football, NCAA college basketball, NFL, MLB, MLS, NHL, PGA, MMA, and the NBA.

16.     In traditional fantasy sports leagues, contestants draft their teams before the season, maintaining the same core roster for months.

17.     In contrast to season-long fantasy sports, DraftKings accepts wagers from bettors for various sporting events using a scheme it created that assigns values (points) based upon the performance of athletes and teams engaged in amateur and professional athletic competitions.

18.     After the sporting events are concluded, DraftKings calculates a score using the scheme it created that awards points based upon the various individual college and professional athletes' performance and pays bettors that have the highest total number of points.

19.     Entry fees on DraftKings range from 25 cents to more than $5,000 dollars.

20.     DraftKings profits from, among other things, the fee that it takes from each entry.

21.     Recently, lawmakers have scrutinized DraftKings' business model and operations, alleging all too familiar similarities between DraftKings and online poker, and other gambling websites.

22.     DraftKings incorrectly claims its sports bookmaking operations were made legal by the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA).

23.     Indeed, former fifteen-term Representative Jim Leach recently stated that his anti-gambling act – the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA) – was supposed to stop gambling on the internet, not promote it, referring to DraftKings.

24.     Poignantly, Leach told The Associated Press:  "There is no credible way fantasy sports betting can be described as not gambling." "Only a sophist can make such a claim."  The federal legislation is codified at 31 U.S.C. 5361 *et seq*.  The Act expressly provides that it shall not be construed as altering, limiting, or extending any state law that prohibits, permits, or regulates gambling within the United States.  31 U.S.C. 5361 § 5361(b).

25.     Moreover, the Federal Bureau of Investigation and the Department of Justice are probing whether the business models of daily fantasy sports betting operators, like DraftKings, violates this and other federal laws.  According to a Wall Street Journal report, FBI agents are now speaking with DraftKings customers to inquire about their experiences with the company.

26.     DraftKings' operations are also unlawful under New York's criminal provisions. DraftKings defines its sports betting scheme as Daily Fantasy Sports ("DFS") in a deceptive attempt to circumvent New York Penal Law ("NYPL") § 225.00, which expressly prohibits profiting from "any contest, game [or] gaming scheme…in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein" – the precise conduct of DraftKings.

27.     NYPL § 225.10 makes it a class E felony to profit from unlawful gambling activity by accepting more than five (5) bets totaling more than five thousand dollars ($5,000), an amount that DraftKings easily exceeds each day it operates.  But knowing this, although mistake of law is no defense to criminal liability, DraftKings nonetheless represented to its customers that its sports betting scheme was legal.

28.     In additional to criminal conduct, DraftKings' operations, decidedly violates New York GOL § 5-401, which is civil law creating private rights of action against DraftKings. Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon

6

any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

29.     Persons, like Plaintiff and the putative class, can and seek to recover damages from DraftKings in the form of restitution and lost wagers.

30.     New York General Obligations Law § 5-411 provides: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

31.     New York GOL § 5-421 provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

32.     In other words, every person who shall, lose at any time, the sum or value of twenty-five dollars or more, and renders that amount to the winner within three calendar months, may, after such rendering, sue for and recover the money lost and rendered.

33.     Plaintiff and the statewide putative class are entitled, as a matter of law, to recover the money that they lost, and in addition, are entitled to any and all fees that inured to DraftKings on account of the contracts being void.

34.     DraftKings communicated to customers that its employees were not allowed to play on its own site, but fraudulently, recklessly, and/or negligently omitted the material fact that its employees were allowed to play on other DFS sites and also that other sites' employees were allowed to play on Defendant's site.

35.     Defendant DraftKings performs internal analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on one site would do on other sites.

36.     Defendant DraftKings failed to disclose the fact that their employees, who have access to confidential, internal data were winning large amounts of money on other DFS sites.

37.     Defendant DraftKings failed to disclose the fact that it also allows other sites' employees - who have access to non-public statistical, analytical, and strategical information - to play on its site.

38.     This access to confidential, internal data has given other sites' employees the upper hand over Defendant's non-employee contestants.

39.     In addition to years of data on optimal strategies, which gives Defendant DraftKings' employees a major advantage, Defendant DraftKings' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

40.     Defendant DraftKings also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

41.     Evidently, since the goal of daily fantasy sports contests is to beat out other players, an employee or other insider with such statistical data and internal and proprietary information would have a significant edge over players such as the Plaintiff and the Class, including the ability to make rosters with enough players different from competitors' rosters.

42.     Subsequent to the accusations of employee's access to insider information, DraftKings ultimately changed its internal rules to prohibit its employees from participating in the online gambling contests for money on its own site as well as its competitor, FanDuel.

43.     Defendant DraftKings' material misrepresentations and omissions fraudulently induced Plaintiff and the class members to give Defendant money, which ultimately went to Defendant and its employees through fees and contest prizes.

44.     Had Plaintiff and/or members of the proposed class known that Defendant had acted in concert with other DFS sites to sanction this practice and to allow employees of DFS sites to play against them, Plaintiff and members of the proposed class would not have played on Defendant's website.

45.     Plaintiff and the nationwide putative class are entitled, as a matter of law, to recover the money that they lost, and in addition, are entitled to any and all fees that inured to DraftKings on account of the contracts being void or, in the alternative, breached by DraftKings.

**B.      FanDuel**

46.     Defendant FANDUEL, INC. is a Delaware Corporation headquartered in New York, New York, with its principal place of business in New York City.  FanDuel is authorized to conduct business and does conduct business throughout the State of New York.

47.     FanDuel is operating an illegal online sports betting business within the State of New York.  In addition to its operations being illegal, its contests are intentionally unfair, rendering its contracts with its customers unconscionable and void of good faith.

48.     FanDuel defines its sports betting scheme as Daily Fantasy Sports ("DFS") in a feeble attempt to circumvent New York Penal Law ("NYPL") which expressly prohibits profiting from "any contest, game [or] gaming scheme…in which the outcome depends in a

material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."

49.     DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis.

50.     FanDuel's sports betting contests are based upon the performance of team and individuals that participate in NCAA college football, NCAA college basketball, NFL, NBA, MLB and the NHL.

51.     In traditional fantasy sports leagues, contestants draft their teams before the season, maintaining the same core roster for months.

52.     In contrast to season-long fantasy sports, FanDuel accepts wagers from bettors for various sporting events using a scheme it created that assigns values (points) based upon the performance of athletes and teams engaged in amateur and professional athletic competitions.

53.     After the sporting events are concluded, FanDuel calculates a score using the scheme it created that awards points based upon the various individual college and professional athletes' performance and pays bettors that have the highest total number of points.

54.     Bettors select an entry fee, which is up to $5,000, and the number of games or teams they wish to play.  If their roster generates more points than their rivals, on that day or week, they win all the money in the pot, minus FanDuel's average 6.5% cut.

55.     Defendant makes money on the fee or "rake" that they take from each entry into their contests.

56.     Moreover, Defendant often "guarantees" prize pools, and alleges that it will pay out the difference between the guarantee and the entry fees (called the "overlay") in the event that there are not enough entry fees.

10

57.     This provides Defendant with an additional incentive to attract as many users and entries as possible into daily fantasy sports contests to avoid having to pay out this overlay, or to have its own employees win prize pool money through inside information.

58.     FanDuel is outdueling rivals like DraftKings and Draft, claiming an 80 percent market share of daily fantasy sports betting and boasting more than 1 million paid active users – numbers that in 2014 translated to $622 million in entry fees, and cash payouts in excess of $564 million. FanDuel expects to pay out more than $1 billion in 2015, corresponding to roughly $100 million in revenue.

59.     Defendant refers to its new, less skilled users as "fish," and relies on said users to keep its most active bettors (i.e. its most profitable entry fee generators) active on its site.

60.     FanDuel's CEO has also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players playing on the site.

61.     Plaintiff and the members of the class have paid entry fees to FanDuel in order to compete on Defendant's web site.

62.     Recently, lawmakers have scrutinized FanDuel's business model and operations, alleging all too familiar similarities between FanDuel and online poker, and other gambling websites.

63.     FanDuel incorrectly claims is sports bookmaking operations were made legal by the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA).

64.     Indeed, former fifteen-term Representative Jim Leach recently stated that his anti-gambling act – the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA) – was supposed to stop gambling on the internet, not promote it, referring to FanDuel.

65. Moreover, the Federal Bureau of Investigation and the Department of Justice are probing whether the business model of daily fantasy sports operators like FanDuel violates this and other federal laws.

66. FanDuel's operations are also unlawful under New York's criminal provisions.

67. FanDuel defines its sports betting scheme as Daily Fantasy Sports ("DFS") in a deceptive attempt to circumvent New York Penal Law ("NYPL") § 225.00, which expressly prohibits profiting from "any contest, game [or] gaming scheme…in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein" – the precise conduct of FanDuel.

68. NYPL § 225.10 makes it a class E felony to profit from unlawful gambling activity by accepting more than five (5) bets totaling more than five thousand dollars ($5,000), an amount that FanDuel easily exceeds each day it operates. But knowing this, although mistake of law is no defense to criminal liability, FanDuel nonetheless represented to its customers that its sports betting scheme was legal.

69. On November 10, 2015, New York Attorney General Eric Schneiderman confirmed that FanDuel has been illegally operating its gambling scheme in New York. The attorney general concluded that "FanDuel's customers are clearly placing bets on events outside of their control or influence, specifically on the real-game performance of professional athletes." The attorney general further confirmed that the wagers placed through FanDuel are on a "contest of chance, where winning or losing depends on numerous elements of chance to a 'material degree'" and ordered FanDuel to cease illegally accepting wagers in New York State.

70. In additional to criminal conduct, FanDuel's operations, decidedly violates New York GOL § 5-401, which is civil law creating private rights of action against FanDuel.

Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

71.     Persons, like Plaintiff and the putative class, can and seek to recover damages from FanDuel in the form of restitution and lost wagers.

72.     New York General Obligations Law § 5-411 provides: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

73.     New York GOL § 5-421 provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

74.     In other words, every person who shall, lose at any time, the sum or value of twenty-five dollars or more, and renders that amount to the winner within three calendar months, may, after such rendering, sue for and recover the money lost and rendered.

75.     Defendant has also engaged in fraudulent and negligent behavior, which violates New York GBL §§ 349 and 350, because the employees at FanDuel have access to an incredible amount of non-public data and information by virtue of their employment by Defendant.

76.     FanDuel communicated to customers that its employees were not allowed to play on its own site, but fraudulently, recklessly, and/or negligently omitted the material fact that its employees were allowed to play on other DFS sites and also that other sites' employees were allowed to play on Defendant's site.

13

77.     Defendant performs internal analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on one site would do on other sites.

78.     Defendant failed to disclose the fact that their employees, who have access to confidential, internal data were winning large amounts of money on other DFS sites.

79.     Defendant failed to disclose the fact that it also allows other sites' employees - who have access to non-public statistical, analytical, and strategical information - to play on its site.

80.     This access to confidential, internal data has given other sites' employees the upper hand over Defendant's non-employee contestants.

81.     In addition to years of data on optimal strategies, which gives Defendant's employees a major advantage, Defendant's employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

82.     Defendant also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

83.     Evidently, since the goal of daily fantasy sports contests is to beat out other players, an employee or other insider with such statistical data and internal and proprietary information would have a significant edge over players such as the Plaintiff and the Class, including the ability to make rosters with enough players different from competitors' rosters.

84.     On October 6, 2015, Defendant ultimately changed its internal rules to both prevent its employees from playing on other DFS sites and to prevent other DFS employees from playing on its own site.

14

85.     Defendant's material misrepresentations and omissions fraudulently induced Plaintiff and the class members to give Defendant money, which ultimately went to Defendant and its employees through fees and contest prizes.

86.     Had Plaintiff and/or members of the proposed class known that Defendant had acted in concert with other DFS sites to sanction this practice and to allow employees of DFS sites to play against them, Plaintiff and members of the proposed class would not have played on Defendant's website.

87.     Plaintiff and the nationwide putative class are entitled, as a matter of law, to recover the money that they lost, and in addition, are entitled to any and all fees that inured to FanDuel on account of the contracts being void or, in the alternative, breached by FanDuel.

**Facilitator Defendants**

88.     Defendant VISA, INC. ("VISA") is a Delaware corporation headquartered in California.  VISA is a citizen of the States of Delaware and California.  VISA is a financial services provider authorized to conduct business and does conduct business throughout the State of New York.  VISA receives a fee from the Bank Defendants for facilitating the transfer of the monies that the Bank Defendants lend to persons that such persons use for illegal gambling with DraftKings and FanDuel.

89.     Defendant MASTERCARD, INC. ("MASTERCARD") is a Delaware Corporation headquartered in Purchase, New York.  MASTERCARD is a citizen of the States of Delaware and New York.  MASTERCARD is financial services provider authorized to conduct business and does conduct business throughout the State of New York.  MASTERCARD receives a fee from the Bank Defendants for facilitating the transfer of the monies that the Bank

Defendants lend to persons that such persons use for illegal gambling with DraftKings and FanDuel.

90.     Defendant AMERICAN EXPRESS CREDIT CORPORATION ("AMEX") is a Delaware Corporation headquartered in New York, New York.  AMEX is a citizen of the States of Delaware and New York.  AMEX is financial services provider authorized to conduct business and does conduct business throughout the State of New York.  AMEX receives a fee from the Bank Defendants for facilitating the transfer of the monies that the Bank Defendants lend to persons that such persons use for illegal gambling with DraftKings and FanDuel.

**Bank Defendants**

91.     Defendant J.P. MORGAN CHASE & CO. ("J.P. MORGAN") is a Delaware Corporation headquartered in New York.  J.P. MORGAN is a citizen of the States of Delaware and New York.  J.P. MORGAN is a bank authorized to conduct business and does conduct business throughout the State of New York.  JP MORGAN issues loans for illegal gambling offered by FanDuel and DraftKings, which loans the recipients use to place bets through FanDuel and DraftKings.

92.     Defendant MERRICK BANK CORPORATION ("MERRICK") is a Delaware Corporation headquartered in Utah.  MERRICK is a citizen of the States of Delaware and Utah.  MERRICK is a bank authorized to conduct business and does conduct business throughout the State of New York.  MERRICK issues loans for illegal gambling offered by FanDuel and DraftKings, which loans the recipients use to place bets through FanDuel and DraftKings.

93.     Defendant CAPITAL ONE BANK ("CAPITAL ONE") is a Delaware Corporation headquartered in Virginia.  CAPITAL ONE is a citizen of the States of Delaware and Virginia.  CAPITAL ONE is a bank authorized to conduct business and does conduct

business throughout the State of New York.  CAPITAL ONE issues loans for illegal gambling

offered by FanDuel and DraftKings, which loans the recipients use to place bets through

FanDuel and DraftKings.

**Payment Processor Defendants**

94.     Defendant PAYSAFECARD.COM USA, INC. ("PAYSAFE") is a Delaware

corporation headquartered in New York. PAYSAFE is a citizen of the States of Delaware and

New York.  PAYSAFE is a merchant processor authorized to conduct business and does conduct

business throughout the State of New York.  PAYSAFE serves a "player banking function"

receiving a fee as the financial intermediary between FanDuel and DraftKings and its customers.

95.     Defendant VANTIV INC., ("VANTIV") is a Delaware corporation headquartered

in Ohio. VANTIV is a citizen of the States of Delaware and Ohio. VANTIV is a merchant

processor authorized to conduct business and does conduct business throughout the State of New

York.  VANTIV serves a "player banking function" receiving a fee as the financial intermediary

between FanDuel and DraftKings and its customers.

**JURISDICTION AND VENUE**

96.     This Court has original subject matter jurisdiction over this action pursuant to the

Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.,* which commands federal jurisdiction in a

class action where at least one plaintiff or one member of the class is diverse from at least one

defendant, where there are at least 100 members of the proposed class, and the amount in

controversy exceeds the sum or value of $5,000,000 to a reasonable probability.

97.     Plaintiff is a resident of New York State, and at least one Defendant is not a

citizen of the State of New York (*e.g*., VISA).  Accordingly, minimal diversity exits between the

parties because at least one member of the class is diverse from at least one defendant.  There are

17

at least 100 members of the proposed class and the amount in controversy exceeds $5,000,000 to a reasonable probability. Therefore, CAFA jurisdiction properly lies with this Court.

98.     This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of Plaintiff's civil claims arises under the Constitution, laws or treaties of the United States, specifically, violation of 18 U.S.C. § 1962.

99.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

100.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a portion of the events and conduct giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

### FanDuel and DraftKings Operate Illegal Gambling Businesses.

101.    FanDuel and DraftKings created sports betting schemes that they have termed Daily Fantasy Sports (or "DFS").

102.    FanDuel's and DraftKings' DFS sports betting schemes have several formats but most require gamblers to place bets on the performance of teams and individuals that participate in NCAA college football, NCAA college basketball, NFL, MLB, MLS, NHL, PGA, MMA, NBA and NASCAR.

103.    FanDuel's and DraftKings' DFS schemes track player and team performance over a single game.

104.    Bettors select a predefined numbers of players, and sometimes teams (*e.g.* entire defense) and wager on the performance of the athletes selected.

105.   FanDuel and DraftKings define the list of players each bettor can select and establish a handicap (spread) for each player, based upon the player's anticipated performance.

106.   Once a bettor selects the players or teams to wager on, there is no ability to control the outcome of the simulated gambling scheme.

107.   Specifically, the bettors have no ability to control how many points their simulated teams receive from an actual player's performance.

108.   The actual athletes in the actual games control their own performance.

109.   As a result, after a bettor places a wager and sets a final lineup, the bettor has no ability to influence the outcome of a simulated game.

110.   The bettors must wait to see what happens based upon the performance of the actual players selected.

**FanDuel's and DraftKings' DFS Schemes Offer Different Types of Wagering.**

111.   FanDuel and DraftKings DFS schemes offer bettors the opportunity to wager on two different types of sports bets, head-to-head and tournaments.

112.   In head-to-head gambling events, one bettor wagers against another bettor. The bettor with the highest total score will win the entire payout pool.

113.   Tournaments are simulated gambling events that involve more than two bettors. The most common tournament types are (1) 50/50; (2) double-up; (3) triple-up/quadruple-up/quintuple-up/etc.; and (4) top-X.

114.   50/50 and double-up wagering events are similar but not identical.

115.   In a traditional 50/50 wagering event, a gambler's goal is to end up in the top half of total scores.

116.    Bettors who finish in the top half will equally split the payout pool. As a result, half the bettors will lose their bet and half the owners will win.

117.    The winning bettors, however, will not actually "double" their bet because both FanDuel and DraftKings take a "rake" from the total amount wagered for the particular event.

118.    For example, in a 100 person, 50/50 simulated game with a $10 entry wager amount, the total value of money bet is $1,000.

119.    The 50 highest scoring bettors would receive $18, the 50 lowest scoring owners would receive $0, and the bookie (either FanDuel or DraftKings) would receive $100 as a vig paid by the winning bettor.

120.    The vig charged to gamblers by FanDuel and DraftKings is similar to the vig charged by other sportsbooks, including sportsbooks operating legally in Nevada.

121.    By contrast, in a double-up simulated game, FanDuel and DraftKings restricts the total number of participants and makes payouts to a certain number of bettors.

122.    For example, if a DFS scheme restricts the total number of bettors to 110 with a required wager amount of $10, payouts will be made to the bettors that with the top 50 scores.

123.    Bettors finishing in the top 50 scores would receive $20, a bettors finishing in the bottom 60 scores would receive $0, and FanDuel and DraftKings would take a $100 rake.

124.    The total payout amount for each DFS scheme is correlated directly with the value the bettors wager for 50/50 and double-up DFS schemes.

125.    FanDuel and DraftKings' DFS schemes increase the payout amount for most wagering events in direct correlation with the total amount wagered by each bettor.

20

**FanDuel and DraftKings Continue to Accept Bets on NCAA Student-Athletes.**

126.    FanDuel and DraftKings' DFS schemes accept bets on the athletic performance of individual NCAA student-athletes.

127.    FanDuel and DraftKings DFS schemes allow bettors to bet on NCAA football and basketball.

128.    Some of the wagering events FanDuel offered for NCAA football on November 17, 2015, were:

| CONTEST  ● GUARANTEED  ● MULTI-ENTRY | ENTRIES / SIZE | ▼ ENTRY | PRIZES |
|---|---|---|---|
| $20K Sat CFB Five Star ($20K Guaranteed, Early Only) | 0 / 20 | $1,065 | $20,000 |
| $40K Sat CFB Monster ($40K Guaranteed, Early Only) | 0 / 148 | $300 | $40,000 |
| $15K Sat CFB Monster ($15K Guaranteed, Late) | 0 / 55 | $300 | $15,000 |
| $1K Wed CFB Horse Collar ($1K Guaranteed, Wed-Thu) | 6 / 11 | $100 | $1,000 |
| $1K Thu CFB Horse Collar ($1K Guaranteed, Thu-Fri) | 3 / 11 | $100 | $1,000 |
| $15K Sat CFB Horse Collar ($15K Guaranteed, Early Only) | 6 / 166 | $100 | $15,000 |
| $2K Sat CFB Horse Collar (Late Afternoon) | 2 / 22 | $100 | $2,000 |

129.    One FanDuel DFS scheme pays $20,000 to gamblers that win bets on performance of college students playing in NCAA football games on November 21, 2015:

| CONTEST  ● GUARANTEED  ● MULTI-ENTRY | ENTRIES / SIZE | ▼ ENTRY | PRIZES |
|---|---|---|---|
| $20K Sat CFB Five Star ($20K Guaranteed, Early Only) | 0 / 20 | $1,065 | $20,000 |

130.    The $20K Sat CFB Five Star wagering event has an entry size of twenty (20) bettors.  Each bettor is required to wager $1,065.  The total amount wagered will be $21,300.

131.    The payout will be $20,000 and FanDuel will take $1,300 as a rake.

132.    FanDuel is offering bettors the chance to wager on college athletes playing in
NCAA football games in the afternoon of November 21, 2015.

| $2K Sat CFB Horse Collar (Late Afternoon) | **2** / 22 | $100 | $2,000 |
|---|---|---|---|

133.    FanDuel's $2K Sat CFB Horse Collar wagering event requires a $100 bet and
limits the participants to twenty-two (22) bettors.

134.    The payout will be $2,000 to the winning bettors and FanDuel will take $200 as a
rake.

135.    FanDuel and DraftKings' establish payout amounts in direct correlation with the
total amount wagered by each gambler for a specific wagering event.

136.    FanDuel must correlate the payout amount with the total amount wagered by
participants in order to generate a profit.

137.    FanDuel could not operate profitably if it did not correlate the payout amount
with the total amount wagered by participants.

**FanDuel and DraftKings' DFS Schemes Are Not Exempt From The Unlawful Internet**
**Gambling Enforcement Act of 2006.**

138.    FanDuel and DraftKings represent that their DFS schemes were rendered legal by
the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"). However, the UIGEA
does not render any form of gambling legal.

139.    The UIGEA established that lending money for illegal internet gambling is
criminal.  The UIGEA established exemptions from criminal liability for loans made for some
securities, commodities and insurance transactions.

140.    The UIGEA also exempted contests that did not charge a fee to participate and fantasy sports that met several criteria, including a requirement that the value of the prize *is not determined by the number of participants or the amount of any fees paid by those participants.*

141.    The value of the "prize" awarded by FanDuel and DraftKings for their DFS schemes is correlated to both the number of participants and the amount of fees paid by the participants. Therefore, FanDuel and DraftKings DFS schemes violate both restrictions set forth in the UIGEA exemption.

142.    Defendants cannot rely upon FanDuel and DraftKings' representation that the UIGEA rendered their DFS scheme legal because the schemes' payouts are so obviously correlated with the amount of fees paid by the participants: *neither FanDuel or DraftKings would be able to profit from their DFS schemes is the payouts were greater than the total value of entrance fees.*

## FanDuel CEO Indicated that Some of DraftKings DFS Schemes Are Not Exempt From The UIGEA

143.    The UIGEA also exempted criminal liability for issuers of loans made for fantasy sports where "winning outcomes . . . are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case of sports events) *in multiple real-world sporting or other events*."

144.    DraftKings' DFS sports betting scheme allows gamblers to place bets on the performance of athletes participating *in single real-world sporting events*, including PGA Golf and NASCAR events.

145.    Accepting wagers on athletes' performance in a single PGA golf tournament and single NASCAR race violates the criminal exemption provided to lenders of money for fantasy sports in the UIGEA.

146.    Unlike DraftKings, FanDuel does not offer fantasy PGA and NASCAR because its CEO is "uncomfortable with the legality of it" since "a reasonable person would consider a golf tournament to be a single event, not multiple events."

147.    DraftKings itself concedes that its DFS sports betting scheme allowing gamblers to place bets on the performance of athletes participating *in single real-world sporting events*, including PGA and NASCAR events, is in violation of the UIGEA.

148.    Specifically, after DraftKings began allowing gamblers to place bets on the performance of NASCAR athletes in May of 2015, DraftKings edited its "Why it's Legal" page in late June of 2015 to remove all references to the UIGEA:



149.    The UIGEA does not render any form of gambling legal, including fantasy sports.

150.    The UIGEA makes it criminal to lend money for illegal gambling and any

exceptions referenced only apply to the lenders of money for illegal gambling, including the

Defendants.

151.    Defendants cannot rely upon DraftKings' representations that federal law

rendered their DFS scheme legal because PGA and NASCAR events are clearly _single_ _real-_

_world sporting events_, which are in violation of the UIGEA.

**FanDuel and DraftKings Violate New York's Criminal Law.**

152.    FanDuel and DraftKings claim their DFS schemes are a game of skill and

therefore, are not illegal gambling.

153.    FanDuel and DraftKings' DFS gambling schemes are predominately games of

chance because an individual athlete performance will always be affected by material elements

of chance that affect scoring and winning outcomes including variables such as player injury,

fumbles, weather conditions, controversial officiating, suspension, or other off-field

circumstances.

154.    If any element of skill is required when placing a bet on a FanDuel or DraftKings

DFS wagering event, it is significantly reduced because bettors must select from a defined pool

of college and professional athletes that each were assigned a handicap spread.

155.    New York law expressly prohibits profiting from "any contest, game [or] gaming

scheme…in which the outcome depends in a material degree upon an element of chance,

notwithstanding that skill of the contestants may also be a factor therein."

156.    New York law makes games of chance illegal even if "the skill of the contestants"

is a factor in determining the outcome.

157.    Contrary to the representations of FanDuel and DraftKings, DFS betting schemes are gambling, predominated by chance, not skill.

**FanDuel and DraftKings Operations Constitute Illegal Gambling.**

    **A.    Nevada Attorney General: FanDuel and DraftKings are Illegal Gambling**

158.    On October 16, 2015, the Nevada Attorney General issued a determination letter, in response to a question posed by the Nevada State Gaming Board, and represented that the "contests" offered by FanDuel and DraftKings constituted gambling that required a license pursuant to Nevada law.

159.    The Nevada attorney general based his conclusion of illegality on the fact that participants that placed bets using FanDuel and DraftKings DFS schemes had no control over the outcome of events. He also cited the inherent randomness in DFS schemes as well as the prize structures offered by the bookies as indications that the services offered constituted gambling.

    **B.    New York Attorney General Issued a Cease and Desist Letter: FanDuel and DraftKings are Illegal Gambling.**

160.    On November 10, 2015, New York State Attorney General Eric Schneiderman, issued a cease and desist letter to FanDuel and DraftKings to immediately cease accepting wagers from New York residents.

161.    The attorney general asserted that FanDuel and DraftKings' services constituted illegal gambling pursuant to the New York State Constitution and  NYPL §§ 225.00-225.4.

162.    In addition, the New York State Attorney General served notice on the parties pursuant to New York State General Business Law §§ 349 and 350 as well as Executive Law §63(12).

163.    Attorney General Schneiderman based his conclusions on the nature of the wagering offered by FanDuel and DraftKings, stating that the control the operators have over the

schemes and the quick turnaround between the contests create the essence of the illegal gambling scheme.

**Bank Defendants Loaned Money For Illegal Gambling.**

164.    Defendants each offer financial services in the credit card service and processing industry.

165.    The Facilitator Defendants offer their credit processing service for online transactions between their customers and entities they conduct business with, including DFS websites.

166.    The Bank Defendants loan money to the bettors that wager on the DFS schemes created by FanDuel and DraftKings.

167.    Specifically, a cardholder wishing to place a bet with FanDuel or DraftKings will input the credit card information on the respective merchant's website.

168.    FanDuel and DraftKings then transmit the transaction information to Bank Defendants.  Bank Defendants record the request and then forward it to the appropriate network.

169.    The network then records the request and forwards it to Processor Defendants.

170.    The Facilitator Defendants then record the request and verify that there are sufficient funds in the credit line or on deposit to cover the payment amount.  If there are sufficient funds, Facilitator Defendants generate and transmit an authorization response, which transmits backwards through the same entities that processed the authorization request.

171.    FanDuel and DraftKings will then transmit a settlement request for the approved authorization request.

172.    FanDuel and DraftKings will then receive the "merchant discount," the difference between the full payment amount and the accumulation of various fees that each of the parties in the payment processing chain assess for their services.

173.    Thus, Defendants profit from, among other things, the transaction fees assessed to all individuals who use their financial services for illegal gambling offered by DraftKings and FanDuel.

174.    Plaintiffs and members of the class regularly use Defendants' services to finance their bets placed with FanDuel and DraftKings.

175.    Subsequently, Defendants attempt to collect the debt from Plaintiff and members of the class. The attempt to collect constituted a participation in the transfer of funds for illegal gambling services such as DraftKings and FanDuel.

176.    Bank Defendants cannot collect debts made for illegal gambling, including debts incurred by Plaintiff and the proposed members of the class.

**Defendants Knew or Should Have Known That They Were Loaning Money For Illegal Gambling.**

177.    Defendants issued or processed loans for individuals that placed wagers with FanDuel and DraftKings.

178.    Defendants knew, or should have known, that the loans made to participants in FanDuel and DraftKings' DFS schemes were for illegal gambling and in violation of the UIGEA, federal and New York State laws.

179.    Significantly, the burden is on the payment provider to prohibit restricted transactions or risk civil or criminal punishment.

180.    FanDuel and DraftKings are operating their sports gambling businesses openly and did not attempt to conceal their gambling scheme.

181.    Defendants continue to lend money (or process loans) to bettors that place bets with FanDuel and DraftKings even after both the New York and Nevada attorney generals publicly disclosed that FanDuel and DraftKings DFS schemes were illegal gambling.

182.    Defendants' participation in lending money for illegal DFS schemes (and subsequent profit) is illegal pursuant to 18 U.S.C. § 1962 which makes it unlawful for an entity to receive profits in connection with the enforcement of an unlawful debt.

183.    As a result of accepting payments for illegal gambling debts, Defendants have been unjustly enriched.

184.    Defendants cannot collect or enforce any debts made for FanDuel or DraftKings illegal DFS schemes.

**Plaintiff Yehuda Guttman**

185.    Over the last year, Plaintiff placed multiple wagers on DFS schemes created by FanDuel and DraftKings.

186.    Plaintiff placed his bets by utilizing his Visa, MasterCard, and American Express credit cards.

187.    Subsequently, the Facilitator Defendants attempted to collect the unlawful debt incurred by Plaintiff utilizing FanDuel and DraftKings' websites.

## CLASS ALLEGATIONS

188.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all other similarly situated individuals, as defined:

> Nationwide Class: (i) all persons who received credit or money from Defendants, and/or owe a debt to, and/or who have satisfied in full or in part any debt to Defendants, which credit or money such persons used to place wagers and/or bets with FanDuel within the past six years; and (ii) all persons who entered into contracts with FanDuel and/or DraftKings, paid FanDuel and/or DraftKings fees or other consideration in connection with those contracts, at some time over the past six years,

and who rendered their losses to FanDuel and/or DraftKings within the past three months; and (iii) all persons who competed in any contest prior to October 6, 2015 where other entries were made by employees from FanDuel, DraftKings, or any other Daily Fantasy Sport site.

New York Subclass: all persons who received credit or money from Bank Defendants, and owe a debt to or who have satisfied in full or in part any debt to Bank Defendants, which credit or money such persons used to place wagers and/or bets with DraftKings from within the State of New York within the past six years.

189.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

190.    Plaintiff is a member of the Class he seeks to represent. This action is properly maintainable as a class action. The proposed Class is so numerous that joinder of all members is impracticable.

191.    There are questions of law or fact common to the Class that predominate over any questions affecting only individual member. Common questions of fact or law include, but are not limited to the following:

a.    Whether Plaintiff and members of the class have entered into contracts with Online Gambling Defendants over the past six years;

b.    Whether such contracts are *per se* void, pursuant to New York criminal law;

c.    Whether such contracts are void pursuant to New York civil law;

d.   Whether the Terms of Use of such contracts are unconscionable, illusory, fraudulent, or otherwise invalid;

e.   Whether Plaintiff and members of class paid monies to Online Gambling Defendants in consideration of those contracts;

f.   Whether Online Gambling Defendants operations are a game of chance under all applicable laws and rules;

g.   Whether Online Gambling Defendants operations violate New York's criminal law;

h.   Whether Online Gambling Defendants operations violate New York's civil law;

i.   Whether Plaintiff and members of the class are entitled to restitution and entitled to recovery of lost wagers from FanDuel and from DraftKings;

j.   Whether Online Gambling Defendants employees used non-public data as described above to gain an advantage on other DFS sites;

k.   Whether Online Gambling Defendants acted in concert with other DFS sites to condone, allow, or promote this practice of betting on insider information;

l.   Whether Online Gambling Defendants were negligent or otherwise acted wrongfully in allowing employees to access and use confidential data;

m.   Whether Online Gambling Defendants were negligent or committed fraud in failing to disclose to the Plaintiff and the proposed Class members that these practices were occurring;

n.   Whether Online Gambling Defendants made the material representations and omissions set forth above and substantially similar material representations to the Plaintiff and the members of the proposed class;

o.  Whether Online Gambling Defendants advertisements and other statements directed towards the Plaintiff and the proposed class members were false, misleading, or unfair;

p.  Whether Online Gambling Defendants owed duties to the Plaintiff and the proposed class members, the scope of those duties, and if they breached those duties;

q.  Whether Online Gambling Defendants fraudulently induced the Plaintiff and the proposed class members into using its website, depositing money into the DFS account, and participating in DFS contests under false pretenses, through material misrepresentations, or through material omissions;

r.  Whether consumers such as Plaintiff and the proposed class members were harmed by Online Gambling Defendants' actions, as described in detail herein;

s.  The extent of the damages caused by the Online Gambling Defendants' acts and omissions;

t.  Whether Online Gambling Defendants violated New York state consumer protection statutes, as well as the consumer protection statutes of other states.

u.  Whether Plaintiff and members of the class have entered into contracts with the Banking, Facilitator, and/or Payment Processor Defendants over the past six years;

v.  Whether such contracts are *per se* void, pursuant to New York criminal law;

w.  Whether such contracts are void pursuant to New York civil law;

x.  Whether Plaintiff and members of Class paid monies to Banking, Facilitator, and/or Payment Processor Defendants in consideration of those contracts;

y.  Whether Banking, Facilitator, and/or Payment Processor Defendants' collection of debts on those contracts violates New York criminal law;

z.  Whether Banking, Facilitator, and/or Payment Processor Defendants' collection of debts on those contracts violates New York civil law;

aa.  Whether Banking, Facilitator, and/or Payment Processor Defendants aided and abetting the Online Gambling Defendants' primary violations, detailed herein;

bb.  Whether the Online Gambling Defendants aided and abetted the Banking, Facilitator, and/or Payment Processor Defendants' unlawful issuances of credit and collection of the same in connection with Online Gambling Defendants DFS betting operations; and

cc.  Whether Plaintiff and members of the Class are entitled to restitution from Banking, Facilitator, and/or Payment Processor Defendants.

192.    The representative Plaintiff's claims are typical of those of the proposed Class and are based upon the same legal theories. The representative Plaintiff's claims arise out of the same practices and course of conduct of Defendant.

193.    The representative Plaintiff's damages arise out of a pattern of nearly identical and repetitive policies and practices conducted by Defendants.

194.    The representative Plaintiff can adequately represent the Class. The representative Plaintiff and his attorneys are experienced in class actions and are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint.

195.    Class certification is appropriate pursuant to Rule 23(b)(2) because Class

members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and

discriminatory policies and practices.

196.    Class certification is also appropriate pursuant to Rule 23 because common

questions of fact and law predominate over any questions affecting only individual members

of the Class, and because a class action is superior to other available methods for the fair and

efficient adjudication of this litigation. The Class members have been damaged and are

entitled to recovery as a result of Defendants' policies and practices.

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962**
**(Against All Defendants)**

197.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all

preceding paragraphs as if fully set forth herein.

198.    Pursuant to 18 U.S.C. § 1962:

> It shall be unlawful for any person who has received any income derived, directly
> or indirectly, form a pattern of racketeering activity or through collection of an
> unlawful debt…to use or invest, directly or indirectly, any part of such income, or
> the proceeds of such income, in acquisition of any interest in, or the establishment
> or operation of, any enterprise which is engaged in, or the activities of which
> affect, interstate or foreign commerce.

199.    DraftKings and FanDuel are operating illegal online gambling websites within the

State of New York. DraftKings and FanDuel depend on Banking, Facilitator, and/or Payment

Processor Defendants to operate their business and process money for participants, including

Plaintiff.

200.    Plaintiffs placed bets on sports contests through DraftKings and FanDuel's

websites. The bets, which allow DraftKings and FanDuel to operate, were facilitated by Banking,

34

Facilitator, and/or Payment Processor Defendants. Many bettors, including Plaintiff, would not have placed wagers if they were unable to use their credit card to do so.

201.   Banking, Facilitator, and/or Payment Processor Defendants have a direct interest in the operation of DraftKings and FanDuel because they profit directly from transactions processed through the online gambling websites.

202.   By its processing of credit card transactions placed through DraftKings and FanDuel's illegal gambling scheme, and loaning of money to Plaintiffs, Banking, Facilitator, and/or Payment Processor Defendants have directed, guided, conducted or participated, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity and/or collection of unlawful debt.

203.   As a result of Defendants' actions, Plaintiff has suffered financial losses.

204.   Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover treble damages, costs and attorneys' fees.

### COUNT II
### <u>VIOLATION OF NEW YORK GOL § 5-441</u>
#### (Against Online Gambling Defendants)

205.   Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

206.   Pursuant to NYGOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

207.   NYGOL § 5-411 sets forth: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

208.    Plaintiff and members of the Class entered into contracts with Online Gambling Defendants that are void.

209.    Plaintiff and members of the Class paid monies to Online Gambling Defendants in consideration of these contracts that are void.

210.    Online Gambling Defendants may not collect money owed pursuant to an unenforceable contract.

211.    Accordingly, Plaintiff and members of the Class are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past six (6) years.

**COUNT III**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

**Banking, Facilitator, and/or Payment Processor Defendants**

212.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

213.    Banking, Facilitator, and/or Payment Processor Defendants unlawfully retained payments from Plaintiffs and profited from the transactions.

214.    As a result, Banking, Facilitator, and/or Payment Processor Defendants have been unjustly enriched through their retention of wagers placed pursuant to an illegal online gambling scheme.

215.    Plaintiffs and the class members are entitled to restitution for their full share of improperly retained money from Banking, Facilitator, and/or Payment Processor Defendants.

**Online Gambling Defendants**

216.    Plaintiff and the members of the proposed class conferred a benefit on Online Gambling Defendants by depositing money and playing in contests on their websites.

217.    Online Gambling Defendants have further benefited from monetarily from unlawful and/or illegal conduct directed to their customers in the State of New York, including from Plaintiff and members of the class.

218.    Online Gambling Defendants' benefit was at Plaintiff's and the class members' expense and to their detriments.

219.    Online Gambling Defendants have thus unjustly enriched itself in retaining the revenues derived from deposits and contest entries made by Plaintiff and the members of the proposed class, which retention under these circumstances is unjust and inequitable because Online Gambling Defendants misrepresented the facts concerning the fair play available on their respective websites.

220.    Plaintiff and members of the proposed class were injured as a direct and proximate result of Online Gambling Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Online Gambling Defendants' websites, which they would not have done had they known the true facts.  Because Online Gambling Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the proposed class is unjust and inequitable, Online Gambling Defendants must pay restitution to Plaintiff and the members of the proposed class for their unjust enrichment.

221.    Moreover, equity and good conscience require that Online Gambling Defendants disgorge profits made thereby, and Plaintiff and members of the class further seek damages on this basis.

## COUNT IV
## VIOLATION OF NEW YORK GOL § 5-411
### (Against Online Gambling Defendants)

222.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

223.    New York GOL § 5-401, which is civil law creating private rights of action against the Online Gambling Defendants.  Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

224.    New York General Obligations Law § 5-411 provides: "All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."

225.    Plaintiff and members of the Class entered into contracts with the Online Gambling Defendants that are void.

226.    Plaintiff and members of the Class paid monies in consideration of these contracts that are void.

227.    Accordingly, Plaintiff and members of the Class are entitled to damages in the form of restitution for monies paid in connection with these void contracts over the course of the past six (6) years.

## COUNT V
## RESTITUTION AND OTHER RELIEF BASED UPON CRIMINAL CONDUCT
### (Against Online Gambling Defendants)

228.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

229.    NYPL § 225.00 defines gambling as "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under his control or

38

influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."

230.    NYPL § 225.10 makes it a class E felony to profit from unlawful gambling activity by accepting more than five (5) bets totaling more than five thousand dollars ($5,000), an amount that Defendants easily exceeds each day it operates.  But knowing this, although mistake of law is no defense to criminal liability, the Online Gambling Defendants nonetheless represented to their customers that thier sports betting scheme was legal.

231.    DraftKings and FanDuel define their sports betting scheme as Daily Fantasy Sports ("DFS") in a deceptive attempt to circumvent New York Penal Law ("NYPL") § 225.00, which expressly prohibits profiting from "any contest, game [or] gaming scheme…in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein" – the precise conduct of FanDuel and DraftKings.

232.    An entity is guilty of promoting gambling in the first degree when it knowingly advances or profits from unlawful gambling activity.  Because of the nature of the gambling services offered by the Online Gambling Defendants, they have committed promoting of gambling in the first degree pursuant to NYPL 225.10.

233.    Criminal conduct creates *per se* findings and liability for civil liability.

234.    Because FanDuel's and DraftKings' conduct is criminal, Plaintiff and members of the Class may recover their losses from on Online Gambling Defendants, including contract considerations.

**COUNT VI**
**VIOLATION OF NEW YORK GOL § 5-421**
**(Against Online Gambling Defendants)**

235.    Pursuant to GOL § 5-401: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

236.    New York GOL § 5-421 provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

237.    Plaintiff and members of the Class have sustained losses, and the Online Gambling Defendants have accepted those losses as its profits, within the past three (3) months.

238.    Because every person who shall, lose at any time, the sum or value of twenty-five dollars or more, and renders that amount to the winner within three calendar months, may, after such rendering, sue for and recover the money lost and rendered, Plaintiff and members of the Class are entitled to these damages from FanDuel and DraftKings.

**COUNT VII**
**FRAUD AND MISREPRESENTATION**
**(Against Online Gambling Defendants)**

239.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all proceeding paragraphs as if fully set forth herein.

240.    Online Gambling Defendants made material representations that were false, that on Online Gambling Defendants knew were false or were reckless as to the truth, and made with the intent to induce Plaintiff and the class to rely upon and act upon.

241.    Specifically, and as detailed above, on Online Gambling Defendants represented that it was not gambling and was legal under applicable state and federal laws.

242.    In addition, and/or in the alternative, on Online Gambling Defendants knowingly and/or recklessly omitted material facts, which on Online Gambling Defendants knew were material, for the purpose of inducing the Plaintiff and the class members to enter on Online Gambling Defendants DFS contest and/or otherwise act upon them.

243.    Plaintiff and the Class members justifiably relied upon and acted based upon these material omissions.

244.    Specifically, and as set forth in detail above, the Online Gambling Defendants represented that their contests were fair, failed to disclose that employees, servants, agents, owners and/or others with access to non-public data would use said information to compete against Plaintiff and the class members (and thereby obtain a greatly increased chance of winning, and correspondingly greatly decrease the ability of the Plaintiff and the class members to use skill in order to win).

245.    Online Gambling Defendants also communicated to customers and prospective customers, such as the Plaintiff and the Class members, that its employees were not allowed to play on their sites, but omitted the material fact that their employees were allowed to play on other sites and that other sites' employees were allowed to play on Online Gambling Defendants' sites.

246.    Online Gambling Defendants also willfully failed to disclose that their employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed class's submissions would use this information to compete against Plaintiff and obtain

an enormous increased chance to win, thereby greatly decreasing Plaintiff and the class's ability to use skill to win.

247.    Online Gambling Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

248.    These material misrepresentations and omissions fraudulently induced the Plaintiff and the Class members to give Online Gambling Defendants money, which ultimately went to Online Gambling Defendants and their employees through fees and contest prizes.

249.    Plaintiff and the proposed class acted in reliance on the false, material representations and omissions made by Online Gambling Defendants, which caused them injury.

250.    Plaintiff and the proposed class would not have deposited money or engaged in any activity on Online Gambling Defendants websites if they had known that the services offered by FanDuel and DraftKings were illegal in nature or that they were competing against individuals with insider knowledge, access and use of non-public data.

251.    Online Gambling Defendants were further aware that the legality of the games was a material fact in inducing Plaintiff and the proposed class to give them money in exchange for services and agreeing to the alleged contract.

252.    As a result of Online Gambling Defendants fraudulent representations and fraudulent omissions, Plaintiff and the proposed class were induced into contracts that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

**COUNT VIII**
**NEGLIGENCE**
**(Against Online Gambling Defendants)**

253.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all proceeding paragraphs as if fully set forth herein.

254.    Online Gambling Defendants owed duties to Plaintiff and the proposed class, as users and paying customers of their sites, to use reasonable care to provide true, reliable, correct and accurate information and fair even-handed contests.

255.    Online Gambling Defendants breached their duties to Plaintiff and the proposed class by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiff and the proposed class.

256.    In the course of their business, profession and employment, Online Gambling Defendants, and their agents, representatives and employees, supplied false and/or misleading information to Plaintiff and the proposed class.

257.    Plaintiff and the proposed class justifiably relied upon the information supplied by Online Gambling Defendants, and as a result, engaged in business with Online Gambling Defendants and lost money due to the misinformation and omissions.

258.    Online Gambling Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff and the proposed class on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiff and the proposed class competed.

259.    As a direct and proximate result of the Online Gambling Defendants' negligence, the Plaintiff and the class members suffered damages and harm in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against Defendants as follows:

a. An award of damages in the form of restitution for the past six (6) years because the contracts are void;

b. An award of damages and other appropriate relief for Defendants' violations of New York State common law;

c. All applicable statutory damages, including treble and punitive damages;

d. Notice to the Classes of the action;

e. An injunction permanently enjoining Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

f. Reasonable attorneys' fees and costs of this action;

g. Pre-judgment and post-judgment interest as provided by law; and

h. Such other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff, on behalf of himself and the proposed class, demands a trial by jury on all claims so triable.

Dated: New York, New York
November 18, 2015

Respectfully submitted,

NAPOLI SHKOLNIK PLLC

____/s/ Hunter Shkolnik_____
Hunter J. Shkolnik
Annie E. Causey
1301 Avenue of the Americas, 10th Floor
New York, New York 10019
(212) 397-1000
hunter@napolilaw.com
acausey@napolilaw.com

IMBESI LAW P.C.

__/s/ Brittany Weiner_____

Brittany Weiner
450 Seventh Avenue, Suite 1408
New York, New York 10123
(212) 736-0007
brittany@icmlaw.com

*Attorneys for Plaintiff and the Putative Class*